Michael Senator for the Appellant's Defenders of Wildlife and Center for Biological Diversity Your Honors, I'd like to address two issues. First of all, I'd like to address the applicable standard here, the may affect standard. And then secondly, I'd like to address the disagreement between the Corps of Engineers and the Fish and Wildlife Service. Regarding the standard at issue here, the Fish and Wildlife Service's Section 7 regulations require an action agency, in this case the Corps of Engineers, to consult any time an action may affect any listed species or critical habitat. And what I'd like to do is to actually parse that definition, because I think it's exceedingly important here, and it highlights that even if you put aside the disagreements, the Fish and Wildlife Service, with the Corps' determinations and repeated requests for consultation, fundamentally the Corps' no effect determinations in this case are unreasonable. First of all, the regulatory standard, as well as Section 7, focuses on species. Again, may affect any listed species. What the Corps did here was to fundamentally focus on potential impacts to individual pygmy owls. As I laid out in our briefs, there are numerous citations to the record, including the Corps' own documents and the government's brief, where fundamentally what the Corps was focused on was the failure of the two project developers here to detect individual pygmy owls on the project site. But again, the standard here is whether or not there are any potential effects on the species, in this case the Cactus frigus pygmy owl population in Arizona. In focusing primarily, if not exclusively, on impacts to individual owls, what the Corps neglected to consider, which the Fish and Wildlife Service did, was to address the impact of these two large-scale development projects on the pygmy owls' long-term survival and recovery. And in particular, I think if you look at some of the comments, some of the letters that the Fish and Wildlife Service wrote to the Corps requesting consultation, what the Service was particularly concerned about was the impact that these two projects would have, again, on the species' long-term recovery. They cited that both projects were located in areas the Service has determined is essential for the species' recovery, and in particular, they're in areas that are important for pygmy owl dispersal. Recent estimates indicate, at least in terms of surveys, that there are perhaps no more than 18 owls remaining in Arizona. Therefore, in order for this species to survive and recover, it's going to be essential that those owls, those dispersing owls, are able to get into some of these other habitat areas. And both of these projects are --. The difficulty is, isn't it, that the Corps said, well, no, in four years, there's only been one sounding of an owl in this area? That's right. But, again, that's focusing on the presence or absence of individual owls. Well, yeah, and what else are you --? But, I mean, what you just said, I thought, is that it was an important area for dispersal. And if there aren't any dispersed, then--. But I think what the Corps failed to do is to take a long-term approach. This is a species that, again, is extremely imperiled. And in many ways, what by focusing on the absence of owls, it's in essence penalizing this species for being so highly imperiled. The reason why it's so difficult to detect individual owls is because the species is down to, again, perhaps 18, maybe several more individual owls. With the Fish and Wildlife Service's scheme here, they've identified areas that this species is going to have to inhabit if this species is eventually going to recover and be removed from the endangered species list. In order to ensure that that can happen, that's going to require that there's adequate habitat protected so that those owls can eventually, down the road, get into some of these additional areas. Help me out. Obviously, the regs focus on critical habitat. And you're talking about potential downstream possible useful habitat. How does one reconcile those two concepts? Well, again, there's two standards. It may affect listed species or critical habitat. What I'm focused on here are impacts to the species. Well, yeah, but your effect on the species comes from effect on noncritical habitat. So aren't you reading out the critical habitat aspect of the statute? No, not at all. Okay. So that's what I'm trying to get at. Why not? This species was fundamentally put on the list primarily, not exclusively, because of loss of habitat. It was not because of loss of critical habitat. The primary threat driving this species to extinction is loss of habitat. What the CORE's position seems to be here is that in the absence of critical habitat, the only way you can reach that may affect threshold is by either directly impacting habitat where one of these few remaining owls happens to be, or you're going to directly impact critical habitat. In the absence of critical habitat. Or just affect the species. Species isn't there. I mean, it's not there. That's right. But biologically, two large-scale development projects, they're going to further destroy the species habitat, which is the reason why it was listed. That's what I'm saying. So you're saying they're going to destroy where they might go in the future sometime? And it's not just in the abstract. Again, these are specific areas that the Fish and Wildlife Service has identified. This is not anywhere owls may go. These are specific areas the Fish and Wildlife Service has identified as being critical to this species' recovery. Not critical habitat. Essential. Important. Important to this species' recovery. Again, I'm just trying to get you to explain to me why that's not adding, writing out critical habitat, and then just saying, well, any time that there is the possibility for a species to inhabit this area, then it's protectable. I'm going to probably repeat myself, but again, from a biological, ecological standpoint, a species as imperiled as the pigmy owl is, a species that has already lost, estimates range, 90% of its historic habitat. For the Corps of Engineers to allow two large-scale development projects to destroy yet more of that habitat, irrespective of whether or not this area is critical habitat, that at the very least raises the possibility that that could affect the long-term survival and recovery of the species. If I could, Your Honor. Can I ask you, I mean, your argument seems to be that the smaller the species becomes, the more land should be reserved for them, because, of course, there's a possibility that they might land here or there within the State of Arizona, so why not have it all pigmy owl territory? Well, again, keep in mind, we're not talking about reserving land. What we're talking about here is simply a threshold for initiating a process. But doesn't your argument go that way? If it gets very tiny, then you've got to have more and more amounts of land reserved for them. Well, that is, in fact, not what we're saying, but, in fact, that would not be an unreasonable argument to make. I mean, the fact is the more imperiled a species is, as the Supreme Court has held in TVA v. Hill, again, under this scheme of institutionalized caution, you would think that the agencies would err on the side of being more protective rather than less. What the CORE's approach seems to be here is, in fact, that the more imperiled the species is, the fewer individual members, the fewer number of times we're going to have to engage the consultation process, the less protection the species is going to receive. A record that there are more endangered species than this one, when there are only 18 left? You mean with respect to other species? Yeah, yeah. Is there any record that this is not the most endangered species in the United States of America? I'm not sure, Your Honor. I couldn't answer that. 18 left. Well, there have only been 18 owls detected. In Arizona. Right, in Arizona, which is all we're talking about here. I understand that, but there are some in New Mexico. Right. And recent evidence indicates that those owls are in decline as well. I understand that. Okay. If I could, Your Honor, to move on to the second aspect of this standard, which is may affect. And if I could read, and I think this is critically important here, from the Federal Register notice published in the 1986 regulations, where it defines may affect as any possible effect, whether beneficial, benign, adverse, or of an undetermined character. That is an extremely low threshold. Even if you take the Corps' approach here, which is that we're just going to focus on potential impacts to individual owls, even under that approach, the Corps' own documents cannot support determination of no effect. With respect to the Continental Reserve Project, and we've cited this in our briefs, the Corps actually has required ongoing surveys. And in the event that an owl happens to actually show up on the project site during construction, the Fish and Wildlife Service is to be notified. So at the very least, the Corps has acknowledged at least the potential that an individual owl may show up on the property and therefore may be affected. With respect to the Entrada del Oro Project, again, we've cited to this as well, the developer's own biological assessment, this is Administrative Record page 161, actually talks about how the project, again, in the developer's opinion, may actually benefit pigmy owls that may disperse through the project area. So again, there was at least a possibility there that those documents demonstrated that owls may at some point appear on the property. Secondly, the Administrative Record documents that the Corps relies on, and in particular with respect to Continental Reserve, the biological evaluation, and with respect to Entrada del Oro, the biological assessment, both of those documents at the very most conclude that these projects are not likely to adversely affect the species. And again, we've cited to those provisions in our briefs. The standard here, again, is not whether or not it was likely to adversely affect. It's whether there is any possibility of impacts to the species. And again, the documents that the Corps itself relies on do not support a finding of no effect. If I could, Your Honor, just very briefly, I would like to reserve some time for rebuttal to address the Corps Fish and Wildlife Service's disagreement here. First of all, to a certain extent, I'm not even sure there actually is a real disagreement here. I think to a certain extent, if I could draw an analogy, these two agencies were similar to two ships passing in the night. On the one hand, we have the Corps focused on impacts to individual owls. We have the Fish and Wildlife Service properly focused on potential impacts to the species. Again, the Corps fundamentally focused on likely adverse impacts. Fish and Wildlife Service, again, focused on any possible effect, which is the correct standard here. Secondly, to the extent there was a disagreement, I think the Court was still unreasonable, given the statutory and regulatory scheme, where you have the Fish and Wildlife Service's disagreement, in and of itself, at the very least. In fact, I think that disagreement defines may affect. The fact that you had the expert agency here going on record repeatedly, raising concerns with the. That's true. Sotomayor, wouldn't Congress have written the statute not to say, as it did, that the action agency had to make the determination? Well, actually, the statute does not say that. With the statute. Regulation. What the statute requires is a consultation. If there's an effect finding. No. What the statute requires is a consultation in ensuring against jeopardy. What the regulations further define is, again, the action agency is required to make that finding. But then they also go on to allow the Fish and Wildlife Service to actually request consultation. And I think where you have a situation, as we have here, where the Fish and Wildlife Service went out of its way repeatedly to request consultation, we're not saying that the Fish and Wildlife Service can in any way force a consultation. But we think where the expert agency, again, goes out of its way to request consultation, the Court does not address those concerns that, again, that, by definition, raises at least the possibility of effects that should have been addressed through the consultation process. See, Counsel, I look at this case, not only a turf war involving the Big Meow, but it's a turf war between two government agencies, the Army Corps of Engineers and the wildlife. And we know what happens when they defend their turf too strongly. We know what happened in the intelligence field when we had the CIA fighting the FBI and the FBI fighting the CIA and both of them fighting the Army. And finally Congress had to step in and said we can't tolerate these turf wars any longer. Your Honor, I think what's instructive here is that this is an extremely rare situation. I mean, there is not, in fact, with the exception of two cases the government cited, which are not even relevant here, I'm not aware of a similar situation. I mean, the fact of the matter is when the Fish and Wildlife Service requests, and this is just my experience, these agencies tend to work these issues out. I think it highlights how unreasonable the Corps' position was here. You don't see many of these cases. I mean, the Corps went out of its way to avoid simply initiating a process. We're not talking about here whether or not the projects will go forward. We're not even talking about to what extent or if any modifications will be required. We're simply talking about initiating a process. I actually find it striking that another federal agency would go to this length to simply avoid initiating that process. Well, the agency you're speaking for isn't here. And you're sort of saying any time they ask for a consultation, it's mandatory to give it to them. No, that's not what we're saying, Your Honor. That's not the effect. If the Fish and Wildlife Service had said to the Corps, Corps, you have to consult because it's Thursday, that would be completely unreasonable and the Corps would be entirely within its rights to say no. But that's not what happened here. The Fish and Wildlife Service, again, laid out specific concerns regarding the impacts this could potentially have on this species' long-term survival and recovery. And in light of that, it was entirely unreasonable for the Corps to say no. Because, again, the fact that the service went out of its way to raise those issues is by definition a may affect situation. Just very briefly, Your Honor, I would like to reserve some time. The government, I think, would like to portray this case as a battle of the experts. Again, I'm not even sure you need to get there. The fact is the Fish and Wildlife Service is the expert agency. By simply raising concerns, that was enough to trigger the may affect situation. But the fact of the matter is under this statutory scheme, the only expert agency is the Fish and Wildlife Service. The Corps of Engineers is not the expert on endangered species matters. There's a reason why Congress required Federal agencies to consult. They may not get Chevron deference, but they get APA deference, don't they? Well, I'm not sure they even get that here, Your Honor. Why not? Because they are not the agency charged with implementing the statute. And even if you go back with respect to the agency charged with making the determination. Right. But at the very least, even to the extent they do get APA deference, their ultimate findings have got to have some basis in the record. And as I just discussed, those findings were unreasonable based on this administrative record. Unless there are any more questions, Your Honor, I reserve my remaining time. Okay. Good morning, Your Honors. May it please the Court. I'm Todd Agard here representing the Corps. I'm going to try and take 15 minutes. Mr. Norman James represents the Estrada de Oro, and he's going to take five minutes. If the Court has some specific questions about the Continental Reserve Project that would be more appropriately directed to their counsel, he's here, Mr. Rick Roman, but he's not going to affirmatively make a presentation unless it appears appropriate. Okay. Thank you. The Corps' no effect determination in this case must be upheld unless there is no rational connection between the facts in the record and the conclusions that it reached. And Defenders, in this case, relies almost exclusively on the fact that the Fish and Wildlife Service disagreed with the Corps' determinations. But the Corps had to, under the Fish and Wildlife Service's own regulations, the Corps is the agency that has the ultimate say, and the Corps had to make its own determinations based on its own judgment and its own experts. Unless Defenders can show, which they have not, that there was an irrational conclusion based on the facts in the record, they haven't established a basis under the APA for setting aside the agency action. Now, the record in this case shows that both of the Corps' no effects determinations were reasonable. As the Corps has pointed out, for both of these properties, it's not within designated critical habitat, and there have been over a period of years rather extensive surveys on the property under the Fish and Wildlife Service's own protocol that show that there's no owls on the property. Now, it could be that in a particular case that that alone would be the basis for a no effect determination, and that appears to be what Defenders has assumed that the Corps did here. But actually, the record is very clear that that's not all that the Corps relied on, and I think that's appropriate to avoid a lot of the arguments that Defenders has posed this morning. In particular- How many fake owls are there in the United States? Well, as the Corps pointed out here, we're only talking about in Arizona. I understand. That's not my question. Even in Arizona, we just don't know. There are surveys over a period of years, sometimes finding about 40, sometimes finding about 18. But if you look at the Fish and Wildlife Service's notices where they listed it where there may be pigmy owls that we haven't been able to survey. For example, there's an Indian reservation that doesn't allow the Fish and Wildlife Service on the property on their reservation to survey. They believe there may be a number there. They believe there may be more down towards the border that they haven't found. If you don't know, how can you say they're not in danger of being extinct? No, that's not what we're saying. The listing has been the subject of other litigation that's not at issue here. Other things are going to make them extinct except the conduct of the Corps. Excuse me? Other factors are going to make them extinct except whatever the Corps does. I think that under the management of the federal agencies, nothing will make them extinct. There is some question as to whether they should even remain listed as a population segment in Arizona, and that's still unresolved in the agencies. But in the meantime, they are listed as endangered, but I don't believe that there's any sign that they're going to become extinct. They're just in danger of becoming extinct. Do you think there's a turf war between the Corps and the wildlife? I don't think so. I think that the defenders of wildlife words are well-heeded here, that this type of disagreement is relatively rare. It was a scientific disagreement between the Fish and Wildlife Service scientists and the Corps scientists. It happens relatively rarely. And it just points out that usually everybody agrees and they don't have to deal with these types of disagreements. But under the Fish and Wildlife Service's regulations, if there is a disagreement, in the end it's up to the action agency to make the determination. It can take into account what the Fish and Wildlife Service said, and I think the record shows here with the letters back and forth between the Fish and Wildlife Service and the Corps that the Corps was bending over backwards to take into account the opinions of the Fish and Wildlife Service. But in the end, it just did not find those persuasive. And I think for a few reasons. One is that it's not as if the Fish and Wildlife Service was coming forward with new facts and new information, new studies that the Corps hadn't considered. It was all about how to interpret the facts that were already there. And the Fish and Wildlife Service, if you look at their letters, they use words like, we would assume that pygmy owls might appear in this area, or it's possible that. And so really, it's sort of what scientific conclusions can be based on what everybody agrees is the relevant evidence. And in the end, the Corps had to go with its own opinions and with its own conclusions. And in fact, there were some problems, some demonstrable errors with what the Fish and Wildlife Service had said. For example, with the Continental Reserve property, as I think Judge Ryburn mentioned, there was one owl that was found on one occasion half a mile away. And the Fish and Wildlife Service came in and said, well, that should lead to a may affect determination because there's a pygmy owl territory nearby. There wasn't a pygmy owl territory found nearby, and that's demonstrated by the fact that it was only found on one occasion. When they went back, they couldn't find it. This wasn't established territory. This was just an owl passing through. So the Fish and Wildlife Service not only had a disagreement that the Corps was authorized to come to a different conclusion,  but in the end, I think the most important thing is that under the scheme of the APA and under the Fish and Wildlife Service's own regulations, they make absolutely clear that it's the action agency in the end that has to stand or fall based on its own conclusions. Now, you heard defenders repeatedly talk about how this land is specially designated, and it's not critical habitat. I think Judge Reimer got that out of them, but they never specified what is this special designation that this land has. The only thing that I can think of that they're referring to, because this land has no special designation, is that there was a draft recovery plan that was issued for comment in 2003 that did discuss some of these properties, but that was just a draft document, and that came out after the determinations in this case. And so that information wasn't part of the administrator record. It wasn't before the Corps, and I think under a pretty well-established APA precedent, you can't look at things that weren't even before the agency and impugn the agency's judgment based on that. If defenders is not relying on that, I don't know what they're talking about, because these lands are not specially designated for any special protection for the owl. All they are is it is within the historic range of the pygmy owl, and it contains some marginal pygmy owl habitat. This is not critical habitat. It's not essential habitat, which is just another word for critical habitat. If you look at these dispersal analyses that I was referring to before that were the basis of the Corps' judgment that there would be no effect, what they looked at is what would happen in the future if pygmy owls kind of came through this area. Would there be an effect? And that's precisely what defenders have said that the Corps ignored, but that's not. And if you look at, for example, pages 157 and page 23 of the excerpts of record, you have analyses there that say what would be the potential future dispersal in the area, and would there be room for the pygmy owls to disperse in this area without any impact on them from this development. And those analyses concluded that there would be no impact on dispersal. There is nothing in the record, factual record, to indicate to the contrary. All you have is the Fish and Wildlife Service coming through, and without any other study or anything else saying we disagree with that. You're not claiming that they're not migratory. Well, actually, they're not migratory. They are or they aren't? They are not migratory birds. They're not? They don't move? They don't fly from one place to the next? They move, but only within short ranges, but they don't migrate in the sense that when you refer to a migratory bird, usually you refer to a bird with, like, summer range and winter range. What range did they move to? I think that I'm trying to think. They establish their territories, and once they establish their territories, they don't move very far. If you look at the Fish and Wildlife Service's listing rule, it goes into great detail about that. The maximum range that they move to? It depends on if you mean once they've established their territory, or when a young is born, it'll move to a new territory. Under any circumstance. Excuse me. Oh, I think, and I might be wrong. I think there is reference in one of the Fish and Wildlife Service's Federal Register notices to a maximum of 35 miles, but I might be wrong about that. I would have to, but if you look at the Federal Register notices for the listing and for the critical habitat and the proposed critical habitat, they go into rather great detail about the biology of the pygmy owl in more detail than I have either the expertise or the time to do so this morning. How far away is the nearest owl from the property we're talking about? There's two properties. One of them, Entrada del Oro, the last time that a pygmy owl was found was anywhere near, was in 1971, and that was more than 20 miles away. 20 miles away. And that was in 1971. It hasn't even been found there. What about the other one? In Continental Reserve, in 1998, on one occasion, they found one owl a half a mile away. Okay. But since then, they haven't found any either there or on the property. Both of these properties have been surveyed under the Fish and Wildlife Service's own protocol rather extensively, and no owls have ever been found. There is no evidence whatsoever that any pygmy owl has ever been on either of these properties, and I think that's important. But, again, I think that it's not just the absence of individuals on these properties. It's not just the absence of critical habitat. There was these dispersal analyses, and they looked at potential future use of the area by pygmy owls, and the Corps reasonably determined based on those studies that there wouldn't even be a potential future impact. To the extent that you can even say anything with the Fish and Wildlife Service's conclusions that there was a potential, it was purely hypothetical and conjectural, and the Corps was entitled to come to a different conclusion. You're not claiming that wildlife is irrational in their position in this case? That defenders of wildlife? That's just beyond the scope of— The government agency. Oh. Oh. Sorry. That they are irrational. I would say that that's not the question that this court has to ask, and so we don't— Excuse me. Do you think they were irrational? I think they did. I'm not going to go that far. I would say they did not have the better of the analyses. And in any event, under the arbitrary and capricious standard, the court needs to look at the Corps' analysis, and I think that was eminently reasonable. And I think all we need to say about the Fish and Wildlife Service is that the Corps was entitled to disagree with that and reach its own conclusions. Unless the court has any further questions, I'll yield the rest of my time to the interveners. May it please the Court. My name is Norman James, and I'm representing one of the two developers, Grovesner Holdings, which is developing Entrada del Oro. I just want to clear up a couple of points because I'm not—based on the questions, I'm not sure this is entirely clear. First of all, as Mr. Agard had indicated, there are two different projects. And they're actually quite a bit different. Not that that makes any difference in terms of the ultimate result and the analysis, but my client's property is up near Apache Junction, near the Phoenix metropolitan area. And I think as Mr. Agard was indicating a moment ago, and I think the record is clear on this, Your Honors, no one has ever seen a pig meow on or near the Entrada del Oro property. The sighting that Mr. Agard referred to in response to Judge Ferguson's question, there used to be some pig meows near the confluence of the Salt and Verde Rivers. But as far as my client's property, Your Honors, no one has seen a pig meow there ever, not since my client was doing surveys in preparation for developing the property, but not a hundred years ago. At most, the record says there's some locations that have marginally suitable habitat, and that's it. What's really going on here, and I apologize, let me back up too, Judge Ferguson has also asked on a couple of occasions whether there is a turf war. I wouldn't put it that there is a turf war. What I would say is that, unfortunately, in Arizona, local Fish and Wildlife Service employees, who use the Supreme Court's term in Bennett v. Speer, sometimes tend to get a little overzealous. Ms. James, you're really here to argue the intervention. I'm here to argue the intervention. So you might want to focus your few minutes on that. Okay. Thank you, Your Honor. But I just, again, I just wanted to make it clear that in the – and this actually was a segue into Interveni, into the intervention argument. The declarations that we've submitted in support of intervention that are found in our supplemental excerpts of record, Judge Reimer, I think lay out how the consultation process tends to work in Arizona. And it does tend to be a situation, which is, again, why it's very important to allow private landholders, permit holders to intervene in these suits. It does tend to be a situation where the Fish and Wildlife Service, again, I'm not blasting the whole agency. I'm talking about local employees. They do tend to attempt to use the consultation process, and again, to be blunt, because I can't. Well, let me just be specific. Okay. It seems to me you're – you're rowing upstream without – with a bit of a wave coming against you on the intervention issue, because the whole structure is set up to give the core in this kind of situation the decision about consultation. You were allowed to intervene on the one part of that process that you couldn't effectively influence, which is remedy if one gets there. So what right, what business do you have as a matter of law being a party to the consultation process issue? Now, I apologize, Judge Reimer. I didn't intend to necessarily get off on a tangent here. I think the key focus is on the criteria for intervention as of right under Rule 24. What the district court judge held in this case was that, although we had a protectable interest, under a line of Ninth Circuit. Sotomayor, I don't know what he held. My question is, where do you found a right to be a party to a process that is committed by statute to the action agency? The reason why, Your Honor, is we have the right to participate in that process. Why? I mean, why? We have the right. Because, again, let me back up a step. The Section 7 consultation is triggered by a proposed Federal action. In this case, Your Honor, the proposed Federal action is the issuance of a permit under Section 404 by the Corps of Engineers to my client. In other words, it's my client's action, if you will. The permit is issued to Grovesner Holdings. Under the Fish and Wildlife Service's regulations that govern interagency consultation, at 50 CFR Part 402, as an applicant, my client had the right to participate in discussions between. I'm sure I'm coming at proper with you, because I understand Berg. I was on it, as you know. And there were those folks had a contract right which was being affected. Here, I'm not quite sure I understand what right is affected by the consultation process as contrasted with the remedy process. Well, I think it's okay. Maybe this is where I – first of all, we do have the right to participate in the consultation because we are the permit applicant. Second of all, if we look at the test, Your Honor, under rule – under the applicable rule, Rule 24, the first – there's a four-part test. The protectable interest standard looks at whether you have a legally protected interest that is the subject matter of the lawsuit or could be affected by the lawsuit. Well, the subject matter of the lawsuit is my client's permit. My client as the permit holder, I believe, should have the ability to intervene in a lawsuit that challenges his permit. It's that simple. In fact, the irony is, Your Honor, if we turn around and look at the opposite – look at it from the opposite direction, let's say the court had decided because of concerns about pignails that it was not going to issue the permit to my client. My client would have standing to file a lawsuit challenging the court's decision. So it would have Article III standing, which arguably is a higher barrier than intervening under Rule 24. So you end up with this anomalous situation, Your Honor, where the subject of the lawsuit is my client's permit and actually more broadly my client's development. I mean, that's really what Defenders is complaining about. They don't want my client's property developed. They file a lawsuit against the court, say the court should have consulted, asked that my client's permit be remanded for further consideration. Again, it's my client's permit. It authorizes my client to impact .8 acres of waters of the U.S. Again, it's my client doing the work under the permit, but my client doesn't have the right to participate in the lawsuit. To me, there's something fundamentally wrong when the underlying subject of the action, the underlying property interest, if you will, the permit, that's being attacked in the lawsuit, the holder of the permit isn't allowed to fully participate as a party. And I would argue, Your Honor, that rather than looking at this NEPA line of decisions, as I mentioned before, because NEPA is an unusual statute. It's procedural. It applies only to Federal agencies. It doesn't even necessarily require the Federal agency to reach a particular substantive conclusion. What it does require the Federal agency to do is to take a hard look at the environmental consequences of its action and to ensure that the public has information relating to the action. If you will, it's an informational procedural statute applicable only to Federal agencies. This Court has said, and other circuit courts have said, too, that in a NEPA context, only the Federal agency alleged to have violated NEPA can be a defendant. But really, this is an Endangered Species Act case involving a Clean Water Act permit. I think, as we discussed in our brief, I think the authority that's more directly on point is this Court's decision in Sierra Club v. Environmental Protection Agency, in which the City of Phoenix held Clean Water Act permits relating to discharges of effluent from wastewater treatment plants. EPA was sued, much like the Corps was sued here, for alleged violations of the Clean Water Act. The Ninth Circuit held that Phoenix was allowed to intervene because it held permits, and the effect of its action would be, if the relief was granted, to modify the permits. So what's happening, I think, and I've got ten seconds left just to sum up, I think, first of all, with respect to the merits, I think Judge Jorgensen reached the right result with respect to both properties. You don't consult if species aren't present. If the appeal is upheld, does that moot your application? If you decide that the appeal is moot because, for example, in the case of the Clean Water Act permit. I didn't say that. That wasn't my question. I'm sorry, Your Honor. If we upheld the district court's determination on the merits, does that moot your appeal? No, it does not. The reason it does not is simply because you still have jurisdiction, and that's I apologize for jumping ahead. You still have jurisdiction over the appeal. As we've explained in our brief, we do have this conflict, conflicting authority in Arizona, and I think you do have the ability to issue a decision that clarifies what the appropriate standard is. If you were to dismiss the appeal on jurisdictional grounds and lose jurisdiction over the appeal, then I think, unfortunately, you would lose jurisdiction over my cross-appeal as well. But I think you do have jurisdiction to hear the cross-appeal. Again, my client – I guess what you're saying, Your Honor, is the fact that my client – since my client ultimately won the case, how are they injured? Well, I'm saying if that was upheld, then what difference does it make? What would you say? Well, it makes a big difference, Your Honor, simply because, again, we have a standard – we have courts in Arizona that are relying on the outlier that I discussed in my brief. And the thing that surprises me – one of the things that surprises me in this case is why the property owner doesn't want to settle this problem, this issue. And I say that because I belong to a golf club, and, you know, we're a long, long way from Canadian geese. But we know that Canadian geese have to fly north and they've got to fly south. So we built a lake on the golf course and a feeding area for Canadian geese – Canadian geese and cutthroat geese. And the public relations that we got out of that far outweighed the cost of doing it. Now, it seemed to me that property owners, big property owners in Arizona would want to settle this thing and get a little publicity about a pig being hauled. Your Honor, my client did try to placate the Fish and Wildlife Service. I will refer you to Mr. Charles Kennedy's declaration. It's the first document in our supplemental excerpts of record, pages 1 through 11, that describes in great detail what Grovesner Holdings attempted to do to placate the Fish and Wildlife Service. And the way the process works in Arizona right now, the Fish and Wildlife Service uses the consultation process basically to extort changes to landowners' projects without regard to whether consultation is actually necessary. So I understand your point. It's a valid point. Clients that I represent do attempt to work with the Fish and Wildlife Service, but if you have unreasonable employees at the local level, as Mr. Kennedy's declaration lays out in considerable detail, it can be very difficult to work things out with the agency. Thank you, Your Honor. Thank you very much. Let me just briefly try to get back on this issue of how loss of habitat in the absence of critical habitat can affect the species here. Again, we're talking about a highly endangered species, very few numbers. Most of its habitat has already been lost. The fact of the matter is this species will simply not survive. This species will go extinct if additional habitat, if the little remaining habitat that remains is ---- Speaking of the Arizona pygmy owl? Yes, just the Arizona pygmy owl. Is that a species? It is a species under the Endangered Species Act, at least at the present time, Your Honor. The only way this species is going to survive and recover is if the few remaining owls, if that remaining existing population is able to expand. The only way that population is going to expand is if there's habitat available in other areas to allow dispersing owls to nest, roost, and therefore expand the population. Under the CORS approach, which is we're not going to concern ourselves with that habitat, with habitat that, again, the Fish and Wildlife Service has identified is important to get this species recovered, that will guarantee that this species will go extinct. As a biological matter, those few remaining owls simply will not persist over time. That is precisely why the Fish and Wildlife Service was concerned, irrespective of whether or not there were actually individual owls identified on these project sites. That's why the Fish and Wildlife Service was concerned. Both of these projects were in areas that are identified as being important, again, for getting pygmy owls dispersed into other areas. And then just lastly, Your Honor, with respect to the CORS determination, again, this is covered in our briefs, but I think, let me just cite two documents, the administrative record, two of the documents the CORS maintains it principally relied on. First of all, with respect to Continental Reserve, the biological evaluation, this is excerpts of Record 28, and I'll just cite, it is our opinion that the development of the subject property will not adversely affect pygmy owl or adversely affect critical habitat. Again, will not adversely affect. At most, that's what that document concludes. That is not the standard. The standard here is no effect. Similarly, with respect to the biological assessment on Trata del Oro, excerpts of Record 165, again, that document concludes the project may affect, but is not likely to adversely affect, the pygmy owl. So, again, the two main documents, the COR claims it relied on, clearly support a finding of may affect. They do not support a finding of no effect. At most — Sorry. Could I return to my question? Sure. Because I see you really answered it in putting out two of your own briefs, that this Court had determined that the Fish and Wildlife Service had not adequately explained why the owls in Arizona qualify as a distinctive population segment. That's the candid answer. We don't know. It's been sent back. And your very quick answer, as now, well, no, it's been sent back for determination whether there is such a thing as an Arizona pygmy owl species. At the present time, the pygmy owl remains listed. It's on the list, as you say, but we have questioned the basis for it. That's right. I believe I was on that panel. That's right. Yeah. Well, I think a candid answer was your footnote, too. I apologize. Any further questions? I don't think so. Thank you. Thank you, counsel, for your argument. And the matter has been reviewed. It will be submitted. And we'll mix your argument in Crawford. Thank you.
judges: Ferguson, Noonan, Rymer